TODD A. AND CAROLYN D. DAGRES, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 15523–08.     Filed March 28, 2011.

P, a manager of venture capital funds, lent $5 million in 2000 to S, a business associate who provided leads on companies in which the venture capital funds might invest. P and S renegotiated the loan in 2002, and S stopped making payments in 2003. In settlement of the debt, S transferred some securities to P in 2003. On P's 2003 income tax return, he claimed a $3,635,218 deduction for bad debt under I.R.C. sec. 166(a). R issued a notice of deficiency for 2003, which disallowed the deduction as a business bad debt. *Held*: P was in the trade or business of managing venture capital funds. His bad debt loss was proximately related to that trade or business, and it is deductible under I.R.C. sec. 166(a).

*Joel R. Carpenter*, *David J. Nagle*, and *Barry S. Pollack*, for petitioners.

*Carina J. Campobasso*, for respondent.

GUSTAFSON, *Judge*: On March 21, 2008, the Internal Revenue Service (IRS) issued to petitioners Todd and Carolyn

Dagres [1] a notice of deficiency pursuant to section 6212, [2] determining a deficiency of $981,980 in income tax for 2003 and an accompanying accuracy-related penalty of $196,369 under section 6662(a). After Mr. Dagres's concession that the $30,000 of interest he received in 2003 constitutes taxable income, the issues for decision are whether: (1) Mr. Dagres is entitled to a $3,635,218 business bad debt deduction for 2003 pursuant to section 166(a); and (2) Mr. Dagres is liable for the accuracy-related penalty under section 6662(a).

On the facts proved at trial, we find that Mr. Dagres was in the trade or business of managing venture capital funds; and we hold that he suffered a bad debt loss in connection with that business in 2003, and that it was a business bad debt loss. As a result, he is entitled to deduct the loss under section 166(a). Because the bad debt deduction offsets all of Mr. Dagres's taxable income, he is not liable for the accuracy-related penalty.

### FINDINGS OF FACT

We incorporate by this reference the parties' stipulation of facts with attached exhibits. At the time Mr. and Mrs. Dagres filed their petition, they resided in Massachusetts.

*Mr. Dagres's background*

Mr. Dagres holds a master of science degree in economics and a master in business administration degree. Early in his career he held positions in various firms involved in financing and investing in developing technology companies. In 1994 Mr. Dagres worked as an analyst for Montgomery Securities, an investment bank based in San Francisco, and he focused on the computer networking industry.

*Meeting Mr. Schrader*

In 1994 Mr. Dagres met with William L. Schrader, who in 1989 had co-founded Performance Systems International, Inc. That company provided Internet connectivity to commercial customers and eventually changed its name to PSINet, Inc.

---

[1] Ms. Dagres is a party to this case because she filed a joint Federal income tax return with Mr. Dagres. See sec. 6013(d)(3).

[2] Unless otherwise indicated, all citations of sections are to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and all citations of Rules are to the Tax Court Rules of Practice and Procedure.

(PSINet). Because Mr. Dagres made a favorable impression on Mr. Schrader as someone who was bright and knowledgeable, Mr. Schrader selected Montgomery Securities to take PSINet public. The initial public offering succeeded, and PSINet traded on the NASDAQ Exchange under the symbol PSIX. Mr. Dagres served as the lead investment banker for PSINet's initial public offering in 1995 and 1996, and throughout that period Mr. Dagres and Mr. Schrader had many opportunities to discuss technologies, companies, and the development of the Internet.

*Joining Battery Ventures*

In 1996, after PSINet's public offering, Mr. Dagres left Montgomery Securities to engage in venture capital activities in Boston with a group of associated entities generally referred to as Battery Ventures. When Mr. Dagres joined Battery Ventures, four funds had already been established. Mr. Dagres stayed with Battery Ventures for 9 years (and at the time of trial in 2009 he worked at Spark Capital, another venture capital firm).

*Battery Ventures' organization*[3]

During the relevant years, Battery Ventures was a group of entities that consisted of the following three types:

(1) *Specific venture capital funds*. Each of Battery Ventures' venture capital funds[4] was organized as a limited partnership,[5] and each was governed by a limited partner-

---

[3] The following narrative description of Battery Ventures' organization and operation and Mr. Dagres's place and function therein is depicted in the chart appended to this Opinion.

[4] One commentator gives the following general description of a venture capital fund:

A PE/VC [private equity and venture capital] fund generally raises its capital from a limited number of sophisticated investors in a private placement (including public and private employee benefit plans, university endowment funds, wealthy families, bank holding companies, and insurance companies) and splits the profits achieved by the fund between the PE/VC professionals and the capital providers/investors on a pre-negotiated basis (typically with 20% of the net profits allocated among the PE/VC professionals as a carried interest and the remaining 80% of the profits allocated among the PE/VC professionals and the capital providers in proportion to the capital supplied).

PE/VC professions generally plan and execute PE/VC transactions, including start-ups, growth-equity investments, leveraged and management buyouts, leveraged recapitalizations, industry consolidations, and troubled-company turn-arounds.

Jack S. Levin, Structuring Venture Capital, Private Equity, and Entrepreneurial Transactions, para. 102 (2009 ed.).

[5] A limited partnership is a partnership that has one or more limited partners (who are "limited" in the sense that their liability for partnership debts is limited to their investment in the

Continued

ship agreement. Important in the relevant period were funds named Battery Ventures IV, L.P. (organized in January 1997), Battery Ventures V, L.P. (organized in March 1999), and Battery Ventures VI, L.P. (apparently organized in 2000), which we refer to individually as Fund IV, Fund V, and Fund VI and collectively as the Venture Fund L.P.s.[6] Funds IV, V, and VI were formed during Mr. Dagres's tenure at Battery Ventures. Each Venture Fund L.P. had limited partners (who were its principal investors) and a single general partner.

(2) *Limited liability companies* (*L.L.C.s*).[7] Battery Ventures' L.L.C.s served as the general partners of the Venture Fund L.P.s, responsible for management and investment. Important in the relevant period were Battery Partners IV, L.L.C. (the general partner of Fund IV), Battery Partners V, L.L.C. (the general partner of Fund V), and Battery Partners VI, L.L.C. (the general partner of Fund VI), which we refer to individually as Partners IV, Partners V, and Partners VI and collectively as the General Partner L.L.C.s. The General Partner L.L.C.s were governed by limited liability company agreements that provided for several types of members ("Member Managers", "Special Members", and "Limited Members") and that set out the members' entitlement to share in the profits of the L.L.C. The members of the General Partner L.L.C.s were Battery Ventures personnel. Mr. Dagres was a Member Manager of Partners IV, V, and VI and was entitled to a 12- to 14-percent share of their profits.

(3) *Management companies*. The Battery Ventures management companies provided services to assist the operation of the Venture Fund L.P.s and their General Partner L.L.C.s. Relevant in this suit is Battery Management Co. (BMC), an S corporation that served as a management company in rel-

---

partnership and they do not have management authority) in addition to one or more general partners (who are liable for the debts of the partnership and who have management authority).

[6] The facts about Fund VI (and its related limited liability company) are limited on the record before us (which does not include the limited partnership agreement or the limited liability company agreement), but Fund VI appears to be organized similarly to Fund IV and Fund V. The facts about Fund IV and Fund V are adequate to explain Mr. Dagres's involvement with Battery Ventures. Mr. Dagres also evidently owned interests in Battery Ventures entities with the Roman numeral "III" in their names, but the record does not show the details of their operations or his work in connection with these other entities.

[7] A limited liability company (L.L.C.) is an entity created under State statute. Its owners are called "members". An L.L.C. is like a corporation is some respects (e.g., its owners bear only limited personal liability for the debts and actions of the entity) and is like a partnership in other respects (e.g., the incidents of taxation can pass through to the members).

evant years.[8] Battery Ventures personnel, including Mr. Dagres, were salaried employees of BMC. BMC's shares were owned by the Member Managers of the General Partner L.L.C.s, including Mr. Dagres.[9] At the end of each year, the management company paid unspent service fees to its shareholders, in proportion to their ownership interest in the management company (though the record does not show the fact or amount of actual payments in any particular year).

Mr. Dagres contends that, in addition to these specific entities, "'Battery Ventures' * * * likely constituted an oral partnership or partnership by estoppel under state law" and that this partnership was engaged in a venture capital business that should be attributed to him as a partner. It is true that Mr. Dagres held himself out as a "General Partner" of "Battery Ventures", and literature evidently published by Battery Ventures entities did the same. However, in view of our finding that the General Partner L.L.C.s were engaged in the business of managing venture capital funds, and our holding that this activity is attributed to Mr. Dagres as a Member Manager of those L.L.C.s, we need not and do not resolve the factual and legal issues prompted by this contention of partnership by estoppel.

---

[8] BMC was initially a C corporation, but it elected S corporation status for taxable year 2003. The parties stipulated that BMC provided management services to Fund V and Partners V but stipulated that those services were provided to Fund IV and Partners IV by a different entity—Battery Capital Corp. (BCC), a C corporation. However, the role of BCC is unclear on the record before the Court. Mr. Dagres's testimony about management services addressed only BMC, and BMC received management fees from and provided administrative services to not only Battery Ventures V and its General Partner L.L.C. but also Battery Ventures IV and its General Partner L.L.C. Moreover, BMC was the only management company for the Battery Venture Funds in the year 2000, and during the relevant years BMC was the only Battery Ventures management entity from which Mr. Dagres reported income (specifically, income on Form W–2, Wage and Tax Statement). Consequently, we assume that BMC was the successor to BCC, and this Opinion will speak of BMC as the sole management company of the Battery Ventures group. Any imprecision in the identity of the management company—whether in the stipulation or in the other evidence—does not affect the outcome of any issue in this case.

[9] Mr. Dagres acquired 70 shares of BMC in 1999, and in December 2002 he purchased an additional 11 shares. At all relevant times, BMC had 350 shares outstanding; thus, Mr. Dagres was a 20-percent shareholder from 1999 through 2002, and he owned 23.1 percent of BMC as of December 2002 and throughout 2003.

*Services and fees*

Under the limited partnership agreement of each Venture Fund L.P., its General Partner L.L.C. was responsible for managing the fund and making its investments, in return for a fee. The General Partner L.L.C. in turn entered into a service agreement with BMC, pursuant to which—in return for the General Partner L.L.C.'s promise of an equivalent fee to BMC—Mr. Dagres and other Battery Ventures personnel actually performed the necessary work of managing and investing for the Venture Fund L.P.

Under the service agreement, BMC assumed all the normal operating expenses of the General Partner L.L.C.s, including all routine expenses incident to serving the venture capital activities of the General Partner L.L.C.s. These included the expenses for investigating investment opportunities, compensating the officers and employees of BMC, paying the salaries of the Member Managers of the General Partner L.L.C.s, and paying the fees and expenses for administrative, accounting, bookkeeping, and legal services, office space, utilities, travel, liability insurance, and other related expenses. BMC provided the facilities and staff needed to perform the venture capital business of Battery Ventures, including staff who helped with identifying and researching potential investment targets, staff who helped perform due diligence on those prospects, staff who helped to manage the investments (by providing management assistance to the target companies themselves), and other support staff, such as receptionists, secretaries, accounting personnel, etc.

Each Venture Fund L.P. paid service fees annually of 2 to 2.5 percent of the partners' total committed capital in the fund. The limited partnership agreements obligated each Venture Fund L.P. to pay these service fees to its respective General Partner L.L.C., but each General Partner L.L.C. in turn agreed to reimburse BMC for organizational expenses incurred in setting up the General Partner L.L.C. and the Venture Fund L.P., and agreed to pay a service fee to BMC equal to the service fee described in the limited partnership agreement. Consequently, each Venture Fund L.P. remitted the service fees directly to BMC, by-passing the General Partner L.L.C. that was immediately obligated to perform the management services and entitled to receive the fees.

Those service fees were the revenue source from which BMC paid salaries to its employees.

*Investment and return*

Each Venture Fund L.P. solicited investors to invest (as limited partners) in "developmental and emerging companies primarily in the software, communications and information systems industries primarily in the United States". The total maximum subscription or aggregate investment amount for Fund IV was $200 million, and the maximum for Fund V was $400 million. The aggregate investment amount is also called the amount of pledged funds or the "committed capital" of the fund. Each Venture Fund L.P. had a 10-year life, and each limited partnership agreement provided that the General Partner L.L.C. could not make additional calls for capital contributions by the limited partners after the fifth anniversary of the date of the agreement. [10]

The limited partner investors included insurance companies, pension funds, foundations, and high-net-worth individuals. Each limited partnership agreement required its General Partner L.L.C. to use its best efforts to conduct the partnership's affairs: (1) in a manner to avoid any classification for Federal income tax purposes that the partnership was engaged in the conduct of a trade or business, and (2) in a manner to avoid generating any unrelated business taxable income for any tax-exempt limited partner. The parties therefore agree that the activity of the Venture Fund L.P.s themselves was investment, and not the conduct of a trade or business.

The limited partners contributed 99 percent of each fund's capital. The remaining 1 percent of the funds in the Venture Fund L.P. came from the General Partner L.L.C. The members of that General Partner L.L.C. personally contributed the money to fund that 1 percent, presumably in proportion to their ownership interests in the General Partner L.L.C. (though the record does not show the proportions).

[10] The limited partnership agreements provided that Fund IV began on January 22, 1997, and would end December 31, 2007, and that Fund V began March 31, 1999, and would end December 31, 2009. At the end of that time, each Venture Fund L.P. was to be liquidated and its cash and securities distributed. Thus a capital call could occur for Fund IV as late as January 22, 2002, and for Fund V as late as March 31, 2004. Consequently, at the time he made the loan to Mr. Schrader, Mr. Dagres still had an interest in finding companies in which to invest the funds of Funds IV and V and (since it was organized even later) Fund VI.

The General Partner L.L.C. was entitled to additional compensation for the management and investment services that it was obliged to provide (with support from the management company): Each Venture Fund L.P. granted a 20-percent profits interest to its General Partner L.L.C. This profits interest is called "carried interest" or "carry". As is explained above, this "carry" is an important feature of the venture capital arrangement. Though the venture capital firm makes only a relatively modest 1-percent contribution to the capital of the fund, it obtains an additional 20-percent interest in the profits. [11] It therefore has a very substantial opportunity for gain—and, from the point of view of the other investors, it has a very substantial incentive to maximize the fund's success.

## Mr. Dagres's functions at Battery Ventures

In the period 2000 (the year of the loan at issue) through 2003 (the taxable year at issue), Mr. Dagres was (1) an employee of BMC, (2) an owner of BMC shares, and (3) a Member Manager of General Partner L.L.C.s. Mr. Dagres's responsibilities included finding investment opportunities for the funds; researching, analyzing, and investigating the products, services, and financials of the companies (performing due diligence on the target companies); calling capital (i.e., requesting from limited partners that they fund more of their commitment to the fund so that the fund could invest in the target company); then working with each company (often on its board of directors) to help it achieve the growth or acquisition potential that made it an attractive investment prospect; and finally liquidating the investments before the termination date of the Battery Fund at issue. The BMC staff included researchers who would attend trade conferences and read industry periodicals to identify investment opportunities, and Mr. Dagres also developed and mined his

---

[11] Strictly speaking, it appears that the General Partner L.L.C. obtains slightly less than 21 percent (20 percent plus 1 percent) of the profits. After the investors' capital has been returned to them, 20 percent of the profits is paid to the General Partner L.L.C. in its capacity as manager of the Venture Fund L.P., and then the remaining 80 percent of the profits is distributed to the investors in proportion to their investment. Since the General Partner L.L.C. invested 1 percent of the capital, it receives 1 percent of the investors' share—i.e., 1-percent of 80 percent of the profits. Thus, the General Partner L.L.C. as a 1 percent investor receives 0.8 percent of the profits. For the sake of simplicity, we refer in this Opinion to the 20-percent and 1-percent interests without making this correction.

own network of contacts (including computer and networking industry professionals, attorneys, and investment bankers).

*Mr. Dagres's income from Battery Ventures*

Mr. Dagres earned income through Battery Ventures in three different ways: (1) As an employee of BMC he received a salary, which he called a draw. This salary totaled more than $10 million over the five years 1999 to 2003, as is shown on the chart below. (2) As a stockholder of BMC, he was entitled to receive his proportionate share of any service fees paid to BMC by the Venture Fund L.P.s that remained unused at the end of the year. [12] (3) As a Member Manager of the General Partner L.L.C.s, he was entitled to (and was paid directly by the Venture Fund L.P.s) a proportionate share of the carried interest—the 20-percent profits interest that each Venture Fund L.P. paid to its General Partner L.L.C. [13] In the years 1999 to 2003, this profit interest yielded Mr. Dagres more than $43 million in capital gains, as is shown on the chart below, which summarizes Mr. Dagres's wages and capital gains as reported on his Federal income tax returns:

| Year | Wages & salary | Capital gain |
|------|----------------|--------------|
| 1999 | $917,248 | $2,640,198 |
| 2000 | 2,578,416 | 40,579,415 |
| 2001 | 3,640,916 | –3,000 |
| 2002 | 2,104,276 | 161,568 |
| 2003 | 1,628,012 | –3,000 |
| Total | 10,868,868 | 43,375,181 |

Thus, in the year 2000—the year in which he made the loan at issue (discussed below) and, on this record, clearly his best year—Mr. Dagres earned $2.6 million in his capacity as a BMC employee and $40.6 million in his capacity as a Member Manager. Subjectively, Mr. Dagres's greatest interest was in his "carry" and in his opportunity to maximize it by identifying profitable leads for the Venture Fund L.P.s. That

---

[12] The record does not disclose the precise nature or amount of any excess service fees that BMC paid to Mr. Dagres.

[13] The Venture Fund L.P. also returned to the General Partner L.L.C. its 1-percent capital contribution (i.e., a return of principal) along with the gain on that investment, and Mr. Dagres received his proportionate share of those funds as well.

interest was never greater than when Mr. Dagres was flush with success in late 2000.

*PSINet relationship*

Following PSINet's 1996 public stock offering that Mr. Dagres had managed for his previous employer, PSINet grew and prospered, and Mr. Schrader, as chairman and chief executive officer, prospered with it. By 1999 PSINet had become one of the largest independent Internet service providers in the United States.

When Mr. Schrader learned that Mr. Dagres had moved from Montgomery Securities to Battery Ventures, he got back in touch with him. Mr. Dagres and Mr. Schrader were business acquaintances and not personal friends. Rather, Mr. Dagres recognized Mr. Schrader as an early pioneer of the commercial Internet and a shrewd businessman who had built a very successful company. Mr. Dagres found Mr. Schrader to be an influential and useful contact, part of Mr. Dagres's network of leaders and executives in the industry. Because of PSINet's dominant role connecting companies to the Internet, its management learned of promising young Internet and technology companies very early in their development. Many of these companies sought advice and possibly investment from PSINet, and Mr. Schrader passed some of these entrepreneurial contacts on to various investment bankers and venture capitalists he knew, including Mr. Dagres. PSINet had a venture capital investment branch called PSINet Ventures through which it profitably co-invested with Battery Ventures in Akamai Technologies and Predictive Networks, among others.

PSINet Ventures also used various venture capital funds to vet companies that it was considering investing in. PSINet Ventures primarily focused its investing on PSINet's customers and on companies that could supply PSINet with technology. PSINet would screen the companies for compatibility with PSINet's systems, and then PSINet Ventures would contact outside venture capitalists to investigate the company, doing the thorough "due diligence" on finances, ownership, funding, and other attributes, a function that was outside PSINet's expertise but that was one of the venture capitalist's core competencies. PSINet's goal was to co-invest in the com-

pany, using some money from PSINet Ventures and some from an outside venture capital fund (such as Battery Ventures' funds).

Mr. Schrader was therefore an important source of leads on promising companies for Mr. Dagres to consider investigating as potential investments for the venture funds for which he worked, a source of information on prospective investment targets, and (through PSINet) a source of help for some of the companies in which Mr. Dagres's venture funds invested. In addition, Mr. Schrader and PSINet also invested in Battery Ventures IV and V.

*Making the loan*

When the Internet stock bubble burst in 2000, PSINet's stock was particularly hard hit. Not only was PSINet a major Internet company, but most of its customers were also Internet firms, and the combination of pressure on its stock and weakening revenues from customers with decreasing abilities to pay their bills drove PSINet's stock from $20 per share in August 2000 to $5 per share in October 2000 and to less than $3 per share in November 2000.

Mr. Schrader owned PSINet stock; but he had pledged his stock as collateral for loans and had invested the loan proceeds in various privately held companies and in several venture capital funds. With the value of his PSINet stock plummeting and the value of many of the investments he made with borrowed funds falling, his bankers began demanding additional security or repayment. After exhausting his personal funds and the money he could obtain from family and friends, Mr. Schrader asked Mr. Dagres to lend him $5 million.

With an eye toward strengthening his relationship with Mr. Schrader and PSINet, Mr. Dagres made the loan on November 7, 2000. The $5 million loan was unsecured, evidenced by a demand note, and included interest at the rate of 8 percent annually (at a time when the applicable Federal rate was 6.15 percent). It was understood that, in return for the loan, whenever Mr. Schrader thereafter learned about any promising new companies, Mr. Dagres would be the first he would tell about any opportunities. The parties stipulated that Mr. Dagres—

ultimately decided to make the loan to preserve and strengthen his business relationship with Schrader in order to ensure his access to investment opportunities that Schrader might offer in the future. In other words, petitioner made the loan to get the first opportunity at investing in Schrader's next ventures, from which he would profit through a managing member interest in an LLC general partner of a limited partnership [i.e., a Venture Fund L.P.].

However, PSINet continued to founder, and by the end of November 2000, PSINet traded at $1.13 per share. In April 2001 PSINet fired Mr. Schrader, and on April 27, 2001, NASDAQ delisted PSINet. In 2002 Mr. Schrader repaid $800,000 to Mr. Dagres. Mr. Schrader's financial situation worsened, and to avoid Mr. Schrader's filing for bankruptcy protection, on December 31, 2002, Mr. Dagres forgave the original loan in exchange for a new non-demand promissory note for $4 million, with 1.84-percent interest (when the short-term applicable Federal rate was 1.84 percent), maturing December 31, 2005, and with required monthly payments of $5,000.

Mr. Schrader made six payments of $5,000 in 2003; but on May 31, 2003, he notified Mr. Dagres that he would not be able to make any further monthly payments on the note. At Mr. Dagres's request, Mr. Schrader negotiated with a certified public accountant who worked at Battery Ventures, John O'Connor, and during the negotiations Mr. Schrader stated:

[F]or the record I would like him [Mr. Dagres] to know that which he already knows. I will always give him first opportunity to invest in any and all businesses where there is even the slightest fit between Battery's focus and my future.

Mr. Dagres and Mr. Schrader executed a settlement agreement on December 31, 2003, pursuant to which Mr. Dagres accepted $364,782 in securities [14] from Mr. Schrader and forgave the balance of the $4 million loan as restructured on December 31, 2002.

*Reporting the losses*

Upon the advice of Mr. O'Connor, who worked for BMC (and who in turn consulted with tax counsel at the law firm of

---

[14] These securities included Mr. Schrader's interests in Fund IV and Fund V. The IRS did not challenge the value placed on the securities Mr. Dagres received.

Holland & Knight and with tax specialists at the accounting firm that handled Mr. Dagres's tax return preparation),[15] Mr. Dagres claimed business bad debt losses on his Forms 1040, U.S. Individual Income Tax Return, for 2002 and 2003. In the block next to his name on page 2 of those returns (as on prior returns), Mr. Dagres indicated his "occupation" as "VENTURE CAPITALIST". To the 2002 and 2003 returns Mr. Dagres attached Schedules C, Profit or Loss From Business, that reported a sole proprietorship for which the principal business or profession in line A was "Loan and Business Promotions" and for which the code entered in line B was 523900, which stood for "Other financial investment activities (including investment advice)".

The IRS did not examine Mr. and Mrs. Dagres's 2002 return, and we therefore do not discuss it further.

Although he had received $30,000 in payments and $364,782 in securities from Mr. Schrader in 2003, Mr. Dagres reported no business income on his Schedule C for 2003.[16] He reported one expense, labeled "Bad Debt Loss", in the amount of $3,635,218—the difference between the $4 million principal amount of the loan as renegotiated in 2002 and the agreed value of the $364,782 in securities he received from Mr. Schrader in December 2003.

*Notice of deficiency*

The IRS examined Mr. and Mrs. Dagres's 2003 return and issued a timely notice of deficiency on March 21, 2008. The notice of deficiency stated:

The deduction of $3,635,218 shown on your 2003 return as a business bad debt is disallowed. *The debt was a non-business bad debt because it was a personal loan and not created in connection with your trade or business*. In the latter event, the [loss on the] loan is subject to the limitations of

---

[15] Mr. Dagres contends that his reliance on professional advice supports a claim of "reasonable cause and good faith" under 26 C.F.R. sec. 1.6664–4(b)(1), Income Tax Regs., that would relieve him of the liability for an accuracy-related penalty under section 6662 on the business bad debt deduction if the deduction were not upheld. Since we uphold his deduction, we do not reach this issue.

[16] The parties agree that Mr. Dagres should have reported the six $5,000 payments he received from Mr. Schrader in 2003 as interest income on his 2003 return. It appears, however, that interest that Mr. Dagres accrued on the $4 million debt substantially exceeded $30,000 and that some of the $364,782 that Mr. Schrader paid in the form of securities should have been characterized as interest and not principal. However, the IRS proposed no such adjustment, and we accept the parties' agreement that the amount of unreported interest income was $30,000.

Section 1211 of the Internal Revenue Code. Accordingly, taxable income is increased $3,635,218.00. [Emphasis added.]

The 2003 notice of deficiency determined a tax deficiency of $981,980 and an accuracy-related penalty of $196,396. [17]

*Pleadings and pretrial motion*

Mr. Dagres timely petitioned for redetermination of the deficiency.

In an amended answer filed May 15, 2009, the IRS seeks an increased deficiency based on Mr. Dagres's failing to report the $30,000 received in 2003. In the amended answer, the IRS also asserts two alternative positions with respect to disallowance of the bad debt loss deduction determined in the notice of deficiency.

On June 18, 2009, Mr. Dagres filed a "Motion to Shift the Burden of Proof to Respondent Under Rule 142(a)", asserting that the IRS changed its theory of the case and should bear the burden of proving whether Mr. Dagres was engaged in a trade or business when working as a venture capitalist. At trial we took Mr. Dagres's motion under advisement; and as we explain below in part I of this Opinion, we will deny the motion as moot, since in this case the burden of proof does not affect the outcome.

## ULTIMATE FINDINGS OF FACT

Mr. Dagres was in the trade or business of working as an employee of BMC, to which trade or business his wage income relates. However, he was also a Member Manager of the General Partner L.L.C.s, each of which was in the trade or business of managing venture capital funds, not mere investment. That venture capital management business is attributable to Mr. Dagres. When he made the $5 million loan to Mr. Schrader in 2000, Mr. Dagres's dominant motivation for lending $5 million to Mr. Schrader was to gain preferential access to companies and deals to which Mr. Schrader might refer him, so that Mr. Dagres could use that information in the venture capital activities that he undertook as a Member Manager of the General Partner L.L.C.s. His loan to Mr. Schrader was proximately related to those venture capital

_____

[17] Additional adjustments in the notice of deficiency are computational, and their resolution will depend upon our resolution of the bad debt deduction issue.

management activities and to his personal intention to obtain "carried interest" from the General Partner L.L.C.s; and thus he made the loan in connection with his trade or business. Therefore, we find that he suffered a business bad debt loss in 2003.

## OPINION

The IRS contends that Mr. Dagres's loan to Mr. Schrader was personal and that Mr. Dagres's 2003 loss is a nonbusiness bad debt, deductible only as a short-term capital loss under section 166(d)(1) and subject to the limitations imposed by section 1211(b). Mr. Dagres contends that he was in the trade or business of venture capital (either personally or by imputation from entities he participated in), that he properly claimed a business bad debt deduction, and that it is fully deductible under section 166(a)(1). The question whether the debt was business or nonbusiness is principally an issue of fact. See 26 C.F.R. sec. 1.166–5(b), Income Tax Regs.

## I. *Whether the burden of proof affects this case*

### A. *The general rule*

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer has the burden of establishing that the determinations in the notice of deficiency are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Similarly, the taxpayer bears the burden of proving he is entitled to any disallowed deductions that would reduce his deficiency. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).[18] With respect to a taxpayer's liability for penalties, section 7491(c) places the burden of production on the Commissioner.

### B. *The effect of new matter*

However, Rule 142(a) places the burden of proof on the Commissioner "in respect of any new matter"—i.e., "new" in the Commissioner's answer. Section 7522(a) requires the Commissioner to "describe the basis for" any increase in tax

---

[18] Under certain circumstances the burden can shift to respondent with respect to factual disputes pursuant to section 7491(a). However, Mr. Dagres does not contend that the burden has shifted under this section.

due in the notice of deficiency. "A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence." *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989). However, a "new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof." *Id.*

C. *The arguably new matter in this case*

The notice of deficiency identified the loan deduction disallowance as "Schedule C—Bad Debts from Sales and Services", and explained that "The debt was a non-business bad debt because it was a personal loan and not created in connection with your trade or business." In its motion for leave to amend his answer, however, the IRS described the amended answer as asserting two theories that were alternatives to disallowing the bad debt deduction as a nonbusiness bad debt: (i) that the deduction should be allowed as an unreimbursed employee business expense, or (ii) that the loss should be allowed as an expense under section 212(1). [19]

Mr. Dagres's motion to shift the burden of proof to respondent therefore focuses on the IRS's alternative arguments. He asserts that the IRS implicitly conceded that he was in a trade or business by denying the deduction because the loan "was not created in connection with your business", and he argues that respondent's counsel's asserting at trial that he was not in a trade or business is a new matter requiring him to adduce proof different from that required by the notice of deficiency.

The notice of deficiency did disallow the loss on the grounds that the loan was personal rather than business related, whereas we have found that the loan was *not* personally motivated. This brings into focus Mr. Dagres's contention that any other theory by which the IRS might justify disallowance must be "new". It is true, as Mr. Dagres points out, that the evidence that disproved any personal

---

[19] The amended answer also asserted an increased deficiency due to unreported interest income in 2003. This additional deficiency is clearly a new matter as to which the IRS would have the burden of proof. However, Mr. Dagres has conceded that he failed to report the $30,000 that Mr. Schrader paid in 2003 on his 2003 return, and therefore nothing remains to be proved with respect to that portion of the deficiency.

motivation for the loan to Mr. Schrader is completely different from evidence that would prove that the loan was proximately related to venture capital activity. However, the IRS counters that, even to challenge the notice of deficiency, Mr. Dagres must show not only that the loan was *not* personal but also that it *was* proximately related to a trade or business. That is, the IRS contends, even to rebut the original notice of deficiency, Mr. Dagres must prove the existence of a trade or business to which the loan was related.

D. *The non-effect of a burden shift in this case*

Resolving these competing contentions in order to assign the burden of proof on the various sub-issues might require Solomonic and subtle distinctions—but on this record we can avoid that difficulty, since the preponderance of the evidence resolves these issues no matter which party has the burden of proof. Plainly Mr. Dagres was in the trade or business of being an employee of BMC, and both parties effectively admit as much. The disputed issue is whether Mr. Dagres was also in the trade or business of managing venture capital funds (or whether such a business of a Battery Ventures entity could be imputed to him), but the evidence relevant to the various factual questions subsidiary to that issue is not in equipoise. Rather, those questions are answered by the evidence in the record, particularly the limited partnership agreements of the Venture Fund L.P.s and the limited liability company agreements of the General Partner L.L.C.s. [20]

---

[20] The IRS apparently contends that the agreements are not enough to prove the actual arrangements among the Battery Ventures entities. The General Partner L.L.C.s' tax returns are not in evidence, and the IRS contends that Mr. Dagres did not show that administrative fee income was actually paid by the Venture Fund L.P.s to the General Partner L.L.C.s, rather than being paid straight to BMC. We conclude, however, that the arrangement was the same no matter which of the entities was the payee on the Venture Fund L.P.s checks for administrative services. The record plainly shows that the General Partner L.L.C.s contracted out their management service obligations (and their right to management service fees) to BMC. If the General Partner L.L.C. had received the fees, it would have included them in income but then deducted them when it paid them out to BMC—a wash. The IRS does not contend that anyone avoided tax on the fee income. Nor does the IRS contend that an L.L.C. ceases to be in a trade or business because it employs contractors to perform its business functions. Our finding that the General Partner L.L.C.s were engaged in the trade or business of managing venture capital funds is unaffected by any instruction to the Venture Fund L.P.s to pay the administrative fees directly to BMC.

II. *When bad debt losses are deductible*

A. *Business and nonbusiness bad debts in general*

Section 166(a)(1) provides the general rule permitting full deduction of worthless debts. Mr. Dagres invokes that provision. However, two circumstances may limit that deduction, and the IRS invokes those limits:

First, the IRS points to section 166(d)(1), which provides that "nonbusiness" debts are deductible only as short-term capital losses. Section 166(d)(2) defines a "nonbusiness debt" by exclusion; i.e., it is "a debt other than—(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer, or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Classifying a taxpayer's debt as business or nonbusiness therefore requires a determination of whether he incurred the bad debt loss in a trade or business rather than in some other activity. Section 1211(b) provides that an individual taxpayer like Mr. Dagres may deduct capital losses only to offset capital gains (plus no more than $3,000 on a joint return). Thus, in general, the capital loss deduction for nonbusiness bad debts is much less advantageous than the ordinary deduction for business bad debts. The IRS's primary contention here is that Mr. Dagres's loan to Mr. Schrader was a personal loan that, when it became uncollectible, yielded a nonbusiness bad debt deduction.

Second, the IRS observes that if a debt is incurred in the trade or business of being an employee, then a loss arising from the worthlessness of that debt is deductible as an employee business expense—i.e., as a miscellaneous itemized deduction as defined in sections 63 and 67. As a miscellaneous itemized deduction, an employee business bad debt deduction is subject to the 2-percent floor imposed by section 67 and is not deductible in computing alternative minimum tax under section 56(b)(1). The IRS's alternative contention is that Mr. Dagres's loan to Mr. Schrader was proximately related to his status as an employee of BMC (rather than to a trade or business of managing venture capital funds), so that it yielded a business bad debt deduction that was subject to those strictures. [21]

---

[21] As an additional alternative, the IRS contends that the loss should be allowed as an ex-

B. *Investment activity as a nonbusiness*

Investing one's money and managing one's investments do not amount to a trade or business. *Whipple v. Commissioner*, 373 U.S. 193, 200, 202 (1963). Investors who invest their own funds in public companies or in privately held companies earn investment returns; they are investing, not conducting a trade or business, even when they make their entire living by investing. "No matter how extensive his activities may be, an investor is never considered to be engaged in a trade or business with respect to his investment activities." *King v. Commissioner*, 89 T.C. 445, 459 (1987) (citing *Higgins v. Commissioner*, 312 U.S. 212, 216, 218 (1941)).

However, an activity that would otherwise be a business does not necessarily lose that status because it includes an investment function. Rather, the activity of "promoting, organizing, financing, and/or dealing in corporations * * * for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business" is a business, *Deely v. Commissioner*, 73 T.C. 1081, 1093 (1980) (citing *Whipple v. Commissioner*, 373 U.S. at 202–203), supplemented by T.C. Memo. 1981–229, as is "developing * * * corporations as going businesses for sale to customers", *Whipple v. Commissioner*, 373 U.S. at 203. Bankers, investment bankers, financial planners, and stockbrokers all earn fees and commissions for work that includes investing or facilitating the investing of their clients' funds.[22] Selling one's investment expertise to others is as much a business as selling one's legal expertise or medical expertise.

In cases where business promotion activities are found to rise to the level of a trade or business, a common factor for distinguishing mere investment from conduct of a trade or business has been compensation other than the normal investor's return: "income received directly for his own services rather than indirectly through the corporate enterprise". *Id.* That is, if the taxpayer receives not just a return on his own investment but compensation attributable to his serv-

---

pense paid or incurred for the production or collection of income under section 212(1). We need not reach this argument because we find that the loss is deductible as a business bad debt.

[22] Cf. *InverWorld, Inc. v. Commissioner*, T.C. Memo. 1996–301 (holding that the taxpayer was in a trade or business pursuant to section 864(b); distinguishing "cases [that] did not address taxpayers who managed the investments of others").

ices, then that fact tends to show that he is in a trade or business. Although fee, commission, or other non-investor compensation is a common element, it is not a necessary element, provided the facts support the conclusion that the taxpayer is more than a passive investor. *Farrar v. Commissioner*, T.C. Memo. 1988–385; see also *Deely v. Commissioner*, 73 T.C. at 1093. Notably, in such business promotion cases, the trade-or-business characterization applies even though the taxpayer invests his own funds in, lends funds to, or guarantees the debts of the businesses he promotes. See *Farrar v. Commissioner, supra*.

C. *Proximate relation of loan to business*

A taxpayer may pursue more than one trade or business during a taxable year, see *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987); and where he does so, any bad debt loss that he suffers will be characterized according to the activity that gave rise to the debt. That is, a bad debt loss may be deductible if the taxpayer was in a trade or business *and* the bad debt loss was proximately related to such trade or business (rather than some other activity of the taxpayer). *United States v. Generes*, 405 U.S. 93, 96 (1972). To determine whether a particular bad debt loss is proximately related to the taxpayer's trade or business, we evaluate the taxpayer's dominant motive for making the loan. *Id.* at 104.

The business nexus required for deducting a bad debt under section 166(a) exists where the dominant motive in incurring the debt was protecting or enhancing the taxpayer's trade or business. In the case of an employee, where the dominant purpose of a loan was protecting or enhancing his employment, then the loan will be deductible as an employee business expense. *Id.* In contrast, if the taxpayer's dominant motive was to protect his investment in a corporation—even if it was a corporation by which he was also employed—then the loss is a nonbusiness bad debt. *Id.* at 100–101. How a taxpayer would have benefited from the loan if it had not gone bad can be instructive. *Tenn. Sec., Inc. v. Commissioner*, 674 F.2d 570, 575 (6th Cir. 1982), affg. T.C. Memo. 1978–434. If the goal of the loan was to increase the value of the taxpayer's stock in the company, then the loan is a nonbusiness investment; but if the taxpayer's dominant

motive was to increase his salary or compensation, then the debt is a business debt related to his employment. Where both motives are found, then we must consider all the relevant facts, emphasizing the objective factors and not giving disproportionate weight to any single factor. *Smith v. Commissioner*, T.C. Memo. 1994–640.

III. *Whether Mr. Dagres engaged in venture capital management as a trade or business*

A. *Managing others' investments as a trade or business*

Mr. Dagres contends that, for purposes of section 166(d), the Battery Ventures activity of identifying, developing, and pursuing investment opportunities for other investors in return for compensation is a trade or business, an amalgam of investment banking, stock picking, management consulting, and other disciplines. As that activity is shown on the record, we agree with Mr. Dagres and hold that the General Partner L.L.C.s are in the trade or business of managing venture capital funds. The fact that the subject matter of the activity is (other persons') investments does not dictate that the activity is mere investment. Rather, similar to any bank or brokerage firm that invests other people's money, the manager of venture capital funds provides a service that is an investment mechanism for the customer but that is a trade or business of the manager. In exchange for this service, the fund manager receives both service fees and a profits interest, but neither the contingent nature of that profits interest nor its treatment as capital gain makes it any less compensation for services.

Neither the Code, the regulations, nor the caselaw has defined "trade or business" for all purposes, see *Commissioner v. Groetzinger*, 480 U.S. at 27, but the Supreme Court gave instructive analysis when it considered whether a taxpayer's gambling activity constituted a "trade or business" for purposes of the alternative minimum tax, *id.* "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Id.* at 35. The Supreme Court underscored the distinction between trade or business on the one hand and profit-motivated

transactions that are disconnected from a trade or business on the other, reiterated that an examination of all the facts in each case is required, and held that because Mr. Groetzinger applied skill in a constant effort to earn a livelihood, his gambling activity was a trade or business, and his deduction of losses was not limited by the alternative minimum tax. *Id.* at 35–36.

There is no dispute that Battery Ventures personnel worked continuously and regularly in investing fund money and growing companies, nor is there doubt that their motivation was income and profit. Like stockbrokers, financial planners, investment bankers, business promoters, and dealers, Mr. Dagres and his colleagues undertook a business by which they made money from other persons' investments.

The General Partner L.L.C.s were thus different from an investor (whose *non*business activity involves buying and selling securities for his own account) and were more like a broker (whose business is to buy and sell securities as inventory for commissions), cf. *King v. Commissioner*, 89 T.C. at 457–459 (distinguishing investors and dealers), or more like one who "promot[es] corporations for a fee" or "develop[s] * * * corporations as going businesses for sale to customers", *Whipple v. Commissioner*, 373 U.S. at 202–203. The General Partner L.L.C.s did not vend companies or corporate stock to customers as inventory but nevertheless, like dealers, did earn compensation (in their case, fees and a significant profits interest) for the services they provided in managing and directing the investment of the venture capital entrusted to the Venture Fund L.P.s. The General Partner L.L.C.s provided early-stage funding to companies, primarily with money belonging to others. They actively participated in the growth and development of the portfolio companies and designed and implemented exit strategies for the recovery of the private equity and any profit. Like a stockbroker or a financial planner, the General Partner L.L.C.s received compensation for services they rendered to clients. Accordingly, we are satisfied that the General Partner L.L.C.s' management of the Venture Fund L.P.s has the characteristics of a trade or business.

However, two features of Battery Ventures' arrangements prompt the IRS to dispute the business character of the activity—first, the fact that the General Partner L.L.C. is

itself a 1-percent investor in the investment vehicle (the Venture Fund L.P.); and second, the fact that part of (and if the fund performs well, most of) the General Partner L.L.C.'s return from the activity is capital gain rather than ordinary income. For the reasons we now explain, these facts do not change the business character of the venture capital management activity.

B. *The 1-percent investment*

In the deals that Battery Ventures arranges, the General Partner L.L.C. is an investor in the Venture Fund L.P. That is, the General Partner L.L.C. contributes 1 percent of the total capital, and the other investors invest 99 percent. The IRS contends that the General Partner L.L.C.'s character in the activity is governed by this 1-percent investment. As a factual matter, however, this contention fails.

The General Partner L.L.C.'s incentive for its work was not the 1-percent return it would otherwise get for its 1-percent investment but rather the promised *20 percent* of the Venture Fund L.P.'s profit. And the Venture Fund's motive for offering that 20-percent return was *not* the General Partner L.L.C.'s very modest investment but rather its undertaking to manage the venture capital fund. The extreme disproportion between the 1-percent investment and the 20-percent profit interest yields the conclusion that the overwhelmingly predominant activity of the General Partner L.L.C.—and the activity that characterized it—was its management of the fund.

It cannot be denied that the General Partner L.L.C. has an investment (a 1-percent investment) in the Venture Fund L.P. and is therefore a (1-percent) investor in the Venture Fund L.P. And we do not hold that the 1-percent investment was de minimis (since it amounted to the hardly negligible sums of as much as $2 million for Fund IV and as much as $4 million for Fund V), or that it was nonessential to the arrangement.

But the Venture Fund L.P.'s agreement to pay 20 percent of its profit to the General Partner L.L.C. is inexplicable— and would be absurd—apart from the General Partner L.L.C.'s serving as a venture capitalist. The 99-percent investors were not looking for a 1-percent co-investor; they were

looking for someone in the business of managing venture capital funds, who could locate attractive investment targets, investigate those companies, negotiate investment terms, help the companies to thrive, design exit strategies, liquidate the holdings, and achieve an attractive return for them; and the General Partner L.L.C. conducted that business.

The General Partner L.L.C.s' relatively small activity of investing had a nonbusiness character; but the General Partner L.L.C.'s compensation for its work—i.e., the 20-percent profits interest—dwarfed the General Partner L.L.C.'s expected and actual return on its 1-percent investment. The General Partner L.L.C.s were therefore in the trade or business of managing venture capital funds by virtue of their management activities.

C. *The capital nature of income earned*

The IRS contends that the nonbusiness character of the General Partner L.L.C.'s activity is evident from the fact that it received not ordinary income but capital gain—an investor's return. However, while investment often produces capital gain income, capital gain income is not necessarily indicative of investment activity rather than business activity. See *King v. Commissioner*, 89 T.C. at 460 ("we are faced with the unusual situation of a taxpayer engaged in a trade or business [trading commodity futures] which produces capital gains and losses"). It may be anomalous that, with the IRS's concurrence, a venture capitalist may treat its receipt of "carry" as a nontaxable event, see Rev. Proc. 93–27, sec. 4.01, 1993–2 C.B. 343, 344, and may then report its eventual income as capital gain, see Rev. Proc. 2001–43, sec. 4.01, 2001–2 C.B. 191, 192;[23] but that treatment is not challenged here. Accordingly, even though this profit interest is compensation for personal services, it is deemed to remain pass-through income with the same character in the hands of the

---

[23] See Staff of Joint Comm. on Taxation, Present Law and Analysis Relating to Tax Treatment of Partnership Carried Interests and Related Issues (Part I) 3 (J. Comm. Print 2007) ("the carried interest held by the fund manager is a profits interest in the investment fund partnership. The Internal Revenue Service takes the position that the receipt of a partnership profits interest for services generally is not a taxable event * * * [and that] income from a carried interest may be reported as long-term capital gain"). Although Congress has considered taxing carried interest as ordinary income, see, e.g., American Jobs and Closing Tax Loopholes Act of 2010, H.R. 4213, 111th Cong. secs. 411–413 (2010) (engrossed House amendment, May 28, 2010), it has yet to do so.

recipient (the General Partner L.L.C.) as in the hands of the partnership (the Venture Fund L.P.)—i.e., primarily capital gains from investment. See secs. 701 and 702; 26 C.F.R. secs. 1.701–1, 1.702–1, Income Tax Regs. We do not agree with the IRS that the character of this income proves that the General Partner L.L.C.s were investors and were not in a trade or business.

The IRS relies upon *Syer v. United States*, 380 F.2d 1009 (4th Cir. 1967), and similar cases, which involved taxpayers who claimed they incurred business bad debt losses in their business of organizing and promoting corporations. The Court of Appeals for the Fourth Circuit required the taxpayer to prove not only that his business was to develop corporations into going concerns for sale in the ordinary course but also that his participation in those companies exceeded that of an investor seeking profits from the operations of the businesses. *Id.* at 1010. The Court of Appeals did not answer the question whether the taxpayer was in the business of promoting corporations, because it held that, whether he was or not, the bad debt at issue was sustained by the taxpayer in his capacity as an investor and not in connection with his alleged business. *Id.*

The Court of Appeals observed that its outcome—limiting the deduction to capital loss—was "not inequitable" because "[i]f the business had prospered and the taxpayer had sold his stock for a profit, he would have reported his profit as a capital gain. A loss should receive the same treatment." *Id.* at 1012. However, while *Syer* may well be correct that such a disallowance is "not inequitable", since it would make the income and the loss symmetrical, *Syer* does not hold that the character of anticipated gain necessarily dictates the character of losses. The fact that the income and loss are *not* symmetrical in this case is the result of the anomalous capital treatment, explained above, that is allowed to the recipient of a carried interest. We cannot address this anomaly by giving ordinary business bad debt losses an otherwise unwarranted capital characterization.

This real issue in *Syer*—whether the taxpayer made a given loan as promoter or as investor—is very pointed where, as in *Syer*, the bad debt that the taxpayer would deduct arises from a loan that he made to the very business that he claims is not an investment but is only a promotion project.

The salient question is whether that given corporation is not only a promotion project but instead is also an investment; and the loan, made to that very corporation, is itself some evidence that the corporation is simply an investment. No analogous circumstance exists in this case, where Mr. Dagres's loan was to Mr. Schrader and not to the General Partner L.L.C.s or to the Venture Funds. That loan by Mr. Dagres to Mr. Schrader is itself no evidence that the Venture Fund L.P.s are simply investments of the General Partner L.L.C.s. Thus *Syer* says little that is pertinent to this case.

Likewise, in another case the IRS cites—*Deely v. Commissioner*, 73 T.C. 1081 (1980), modified T.C. Memo. 1981–229—the taxpayer lent money not to a third party but to a corporation that he claimed was a part of his business of promoting corporations. In *Deely* we reached the question not resolved by the Court of Appeals for the Fourth Circuit in *Syer*, and we held that the taxpayer was not in the business of promoting corporations. Among the principal reasons for this holding was that the taxpayer's alleged business promotion activity was (unlike the facts here) *not* "conducted for a fee or commission". *Id.* at 1093. We did indeed note, as the IRS points out, that "he always reported the proceeds as long-term capital gain or loss", *id.* at 1095; but in that case the long-term capital nature of his reported gains was evidence that, contrary to the taxpayer's contentions, he was not making rapid turnaround of his interests in the corporations but was instead holding onto them as long-term investments. Such evidence contradicts a claim that one is in the business of dealing in corporations (rather than holding interests in them for investment); it would not defeat a claim that one is in the business of investing other persons' money and taking as compensation a share of their profits (chiefly capital gains).

As we have pointed out, a General Partner L.L.C. was entitled to a 1-percent investor's return for its investment of 1 percent of the capital of the Venture Fund L.P. However, it was for its management of the venture capital activity (not for its investment) that the General Partner L.L.C. earned the 20-percent carry. The investors considered the efforts of the managers sufficiently valuable to compensate the General Partner L.L.C. with 20 percent of the profits from the venture, above and beyond its 1-percent investment returns.

The General Partner L.L.C.'s function in employing capital—99 percent of which belonged to other investors—was different in quantum and in kind from that of an investor; and the skills that the General Partner L.L.C.s employed in finding, vetting, funding, and helping to manage the target companies produced the returns that the Venture Fund L.P.s enjoyed and shared with the General Partner L.L.C.

Having concluded that the General Partner L.L.C.s' management of the Venture Fund L.P.s was a trade or business, we now turn to the question whether Mr. Dagres made his loan to Mr. Schrader in connection with that trade or business.

## IV. *Whether Mr. Dagres made his loan in connection with the business of managing the Venture Fund L.P.s*

Mr. Dagres was a Member Manager of the General Partner L.L.C.s. The IRS does not dispute that it was as a result of that Member Manager status that Mr. Dagres received his share of the carried interests of those L.L.C.s, and does not dispute that a Member Manager is deemed to carry on the trade or business of his L.L.C. See Rev. Rul. 98–15, 1998–1 C.B. 718; cf. *Hoffman v. Commissioner*, 119 T.C. 140, 149 (2002) ("A general partner may be deemed to be conducting the trade or business activity of the partnership of which she is a member."). We have held that the General Partner L.L.C.s' activity was not mere investment but was the trade or business of managing venture capital funds. Consequently, it follows that Mr. Dagres was in that trade or business.

However, as we have noted, Mr. Dagres was also an investor (i.e., of his portion of 1 percent of the Venture Fund L.P.'s capital), and if his loan to Mr. Schrader was proximately related to his investment interest, then the resulting bad debt was not a business bad debt. Moreover, Mr. Dagres was also a salaried employee of BMC and was therefore in the trade or business of being an employee. If his loan to Mr. Schrader was proximately related to his employment, rather than to the venture capital business, then the deduction of the resulting bad debt loss is severely limited. See *supra* part II.A. We must therefore determine to which of these activities—his investment, his employment, or his venture capital management—the loan was proximately related.

In *United States v. Generes*, 405 U.S. at 103, the Supreme Court indicated that when determining whether a bad debt has a proximate relation to a taxpayer's trade or business and therefore qualifies as a business bad debt, the question to ask is whether the "dominant motivation" for the loan was business; a merely "significant motivation" is insufficient to show a proximate relation. In *Generes*, the Supreme Court held that the dominant motivation for the taxpayer's lending money to his company was not the business motive of protecting his modest salary; rather, in addition to protecting his son-in-law's livelihood, he was motivated to protect his sizable investment in the company. *Id.* at 106. Accordingly, non-business motives prompted the loan, and therefore the loss was not a business bad debt.

In this case, however, Mr. Dagres's compensation for his work as a manager of the Venture Fund L.P.s—i.e., his share of the 20-percent profits interest and the 2-percent management fee—exceeded by twenty-fold his share of the return on the 1-percent investment. Moreover, although his salary from BMC (i.e., his share of the management fees) was significant in absolute terms (nearly $11 million in five years, of which he received almost $2.6 million in the year of the loan), his carry was clearly dominant ($43 million of capital gains in those same five years, of which $40 million was carry received in the year of the loan). He lent $5 million to Mr. Schrader to protect and enhance what he considered a valuable source of leads on promising companies in which, as Member Manager of General Partner L.L.C.s, he could invest the money of the Venture Fund L.P.s, help manage those companies, and earn substantial income in the form of carry. Mr. Dagres's carry significantly exceeded both his salary and his return on his own investment. We are satisfied that venture capital motives and not employment or investment motives were the primary motivation for his loan. It is that venture capital business motive that characterizes the subsequent bad debt loss.

It is true that Mr. Dagres's Schedule C did not identify his principal business or profession associated with the bad debt loss as anything explicitly related to "venture capital", but rather as "Loan and Business Promotions", along with a code entered of 523900, meaning "Other financial investment activities (including investment advice)". As we have pointed

out, however, the caselaw discusses business promotion as meaning "promoting, organizing, financing, and/or dealing in corporations * * * for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business", *Deely v. Commissioner*, 73 T.C. at 1093, and that business overlaps substantially with the business of managing venture capital funds. Moreover, the naming of his business on his return is hardly dispositive of his actual trade or business.[24] Next to his signature on page 2 of his return, he did identify his "occupation" as "VENTURE CAPITALIST"; and the IRS does not suggest any code other than 523900 that would be appropriate for a business of managing venture capital funds. Mr. Dagres's reporting on his return does not estop him from contending that he was engaged in that business.

## V. *Accuracy-related penalty*

Section 6662 imposes a 20-percent penalty on an "underpayment" of tax that results either from negligence or disregard of rules and regulations or from a "substantial understatement" of income tax. See sec. 6662(a) and (b)(1) and (2). Stated simply, an "underpayment" of tax is the amount by which the tax actually imposed by the Code exceeds the amount of tax that the taxpayer reported. Sec. 6664(a).

The IRS imposed an accuracy-related penalty in the notice of deficiency because it found an underpayment attributable to both the bad debt loss and the $30,000 of interest income that Mr. Dagres omitted from his return. Mr. Dagres reported zero taxable income, because the bad debt loss he claimed exceeded the amount of all the income he reported; but when the IRS disallowed the loss and included the income, it determined an underpayment that was attributable to a "substantial understatement".

However, we have held in Mr. Dagres's favor as to the business bad debt loss he claimed. Even though he concedes

---

[24] We consider multiple factors in analyzing whether a taxpayer is engaged in a trade or business and in identifying which trade or business he is in; and no specific factor is conclusive, but all are to be weighed—even an inaccurate or inconsistent description on Schedule C. See *Scallen v. Commissioner*, T.C. Memo. 2002–294, slip op. at 25–26; *Ruppel v. Commissioner*, T.C. Memo. 1987–248 ("Reporting an activity on Schedule C is indicative of a trade or business. However, petitioner's failure to so report his income from lending activities on Schedule C is not conclusive of the absence of a trade or business. This is particularly true when as here the return was prepared by a CPA.").

that the $30,000 of interest income should be included in his income, the bad debt loss still offsets all his income, and for 2003 he has no taxable income and, consequently, income tax liability of zero—the same amount he reported on his return. There is therefore no understatement of income tax for purposes of section 6662(d), and no liability for the accuracy-related penalty.

To reflect the foregoing,

> *An appropriate order and decision will be entered.*

————————————

APPENDIX

Structure and Arrangement of Battery Ventures

