T.C. Memo. 2017-246

UNITED STATES TAX COURT

LENDER MANAGEMENT, LLC, MARVIN K. LENDER REVOCABLE
TRUST, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LENDER MANAGEMENT, LLC, KEITH F. LENDER REVOCABLE TRUST,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 25617-15, 25618-15.         Filed December 13, 2017.

David D. Aughtry, Patrick J. McCann, Jr., and John W. Hackney, for
petitioners.

Christopher D. Bradley, David Delduco, and John W. Sheffield, III, for
respondent.

**[*2]**        MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge:  Petitioners in these consolidated cases are Marvin K. Lender Revocable Trust (Marvin Lender Trust) and Keith F. Lender Revocable Trust (Keith Lender Trust).  On July 9, 2015, respondent issued notices of final partnership administrative adjustment (FPAAs) to Marvin Lender Trust as tax matters partner for Lender Management, LLC (Lender Management), for tax year 2010 and to Keith Lender Trust as tax matters partner for Lender Management for tax years 2011 and 2012.  In the FPAAs respondent disallowed deductions claimed pursuant to section 162 and instead allowed the deductions pursuant to section 212, reflecting respondent's determination that Lender Management was not engaged in carrying on a trade or business.

The sole issue for consideration is whether Lender Management carried on a trade or business within the meaning of section 162 during tax years 2010-12 (tax years in issue).  All section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                              FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petitions were filed, Lender Management's principal place of business was in Connecticut.

Lender Management is a limited liability company formed under the laws of the State of Connecticut. It operates as a fund manager and has been in continuous operation for 25 years. Lender Management elected to be treated as a partnership for Federal income tax purposes.

I.       The Lender Family

Harry Lender (Harry) founded the company that became Lender's Bagels. Harry's sons Marvin Lender (Marvin) and Murray Lender (Murray)[1] worked together with their father and after his death for many years managing Lender's Bagels. Harry had three other children that survived to adulthood, and only the families of Marvin and Murray participated in the partnerships that Lender Management managed. Keith Lender (Keith), Sondra Lender, and Heidi Lender are the children of Marvin and his wife Helaine Lender (Helaine). M.L., J.L.,

---

[1]Murray was deceased at the time of trial.

**[*4]** D.L., and E.L. are grandchildren of Marvin and Helaine.[2]  Carl Lender (Carl), Jay Lender, and Haris Lender are the children of Murray.  A.L., R.L., J.R., O.R.L., D.L.C., and C.L. are Murray's grandchildren.

During the tax years in issue Marvin had a residence in Naples, Florida. The children and grandchildren of Marvin and Murray resided in different States and some lived outside the United States.  Carl resided and worked full time for a cable communications company in Fort Lauderdale, Florida.  Other children of Marvin and Murray lived in California and South America.  The children of Marvin and Murray all had careers.  One of Marvin's grandchildren lives in Israel. Marvin's grandchildren and Murray's grandchildren are rarely in contact with one another.

Numerous divorces among Lender family members created tension.  Around 2000 Murray divorced his wife, and the divorce affected the financial affairs of Murray's branch of the family.  Murray's ex-wife's taking her share of financial assets resulted in Murray's family's having fewer assets under management with Lender Management than Marvin's family.

---

[2]The Court refers to minor children by their initials.  See Rule 27(a)(3).

[*5] II.    Lender Management

Initial ownership of Lender Management was vested in two revocable trusts: Marvin Lender Trust and Helaine G. Lender Revocable Trust (Helaine Lender Trust).  Until December 23, 2010, Helaine Lender Trust owned a 1% interest in Lender Management and Marvin Lender Trust owned a 99% interest.  Marvin, through Marvin Lender Trust, acted as managing member of Lender Management until December 23, 2010.

On December 23, 2010, Keith Lender Trust acquired by assignment a 99% interest in Lender Management and held that interest through December 31, 2012.  After December 23, 2010, and through December 31, 2012, Marvin Lender Trust owned the remaining 1% interest.  After December 23, 2010, Keith, through Keith Lender Trust, acted as Lender Management's managing member.

Lender Management reported net losses of $462,505 and $307,760 for tax years 2010 and 2011, respectively.  It reported net income of $376,238 and $808,302 for tax years 2012 and 2013, respectively.

A.    Investment LLCs

During the tax years in issue Lender Management provided direct management services to three limited liability companies:  Murray & Marvin Lender Investments, LLC (M&M), Lenco Investments, LLC (Lenco), and Lotis

[*6] Equity, LLC (Lotis) (collectively, investment LLCs). Each of the investment LLCs elected to be treated as a partnership for Federal income tax purposes. Lender Management directed the investment and management of assets held by the investment LLCs for the benefit of their owners. The end-level owners with respect to M&M, Lenco, and Lotis were, in each case, all children, grandchildren, or great-grandchildren of Harry.

The following tables show the members of M&M and Lenco, and their respective interests, as of December 31 for each of the tax years in issue.[3]

### M&M

| Member | Yearend 2010 | Yearend 2011 | Yearend 2012 |
| --- | --- | --- | --- |
| Marvin Lender Family, LLC | 89.22% | 87.07% | 84.02% |
| Murray Lender Family, LLC | 8.79 | 6.19 | 5.60 |
| Marvin Lender 1990 Irrevocable Trust | 1.59 | 1.87 | 2.12 |
| Lender Management | 0.40 | 4.87 | 8.26 |
| Total | 100.00 | 100.00 | 100.00 |

---

[3]All ownership percentages have been rounded.

[*7]                               Lenco

| Member | Yearend 2010 | Yearend 2011 | Yearend 2012 |
|---|---|---|---|
| Marvin Lender Family, LLC | 33.78% | 32.51% | 32.47% |
| Murray Lender Family, LLC | 47.85 | 48.07 | 46.58 |
| Marvin Lender 1990 Irrevocable Trust | 10.01 | 10.40 | 10.63 |
| Murray Lender 1990 Irrevocable Trust | 3.75 | 3.89 | 3.98 |
| Lender Management | 4.60 | 5.13 | 6.34 |
| Total | 100.00 | 100.00 | 100.00 |

As of and for some time after December 31, 2009, the members of Lotis were Marvin Lender Family, LLC, Murray Lender Family, LLC, Marvin Lender 1990 Irrevocable Trust, Murray Lender 1990 Irrevocable Trust, and Lender Management.  In 2010 Lotis merged with Lenco, with Lenco as the surviving entity.

The members of Marvin Lender Family, LLC, and Murray Lender Family, LLC, were the following individuals and trusts:

Marvin Lender Family, LLC

| Member | Yearend 2010 | Yearend 2011 | Yearend 2012 |
|---|---|---|---|
| Keith | 11.67% | 11.72% | 10.58% |
| Sondra Lender | 17.54 | 17.49 | 17.17 |

| | | | |
|---|---|---|---|
| [*8] Heidi Lender | 14.11 | 14.46 | 14.48 |
| Marvin Lender Revocable Trust Under Agreement (U/A) | 4.32 | 0.78 | 0.82 |
| Helaine Lender Trust | 21.69 | 22.16 | 20.30 |
| Marvin & Helaine Lender Children Grantor Trust | 24.64 | 25.35 | 26.92 |
| M.L. 2006 Irrevocable Trust | 4.33 | 4.69 | 4.86 |
| J.L. Irrevocable Trust | 1.38 | 1.48 | 1.56 |
| D.L. Irrevocable Trust | 0.32 | 1.88 | 1.97 |
| E.L. Irrevocable Trust | --- | --- | 1.34 |
| Totals | 100.00 | 100.00 | 100.00 |

## Murray Lender Family, LLC

| Member | Yearend 2010 | Yearend 2011 | Yearend 2012 |
|---|---|---|---|
| Carl | 6.75% | 11.72% | 4.69% |
| Jay Lender | 19.59 | 17.49 | 16.85 |
| Haris Lender | 9.01 | 8.65 | 7.20 |
| Murray Lender Revocable Trust | 7.69 | --- | --- |
| Murray Lender Family Irrevocable Trust U/A Dated April 1, 2003 | 29.63 | 30.66 | 32.45 |
| A.L. Irrevocable Trust | 5.75 | 7.00 | 7.61 |
| R.L. Irrevocable Trust U/A | 4.85 | 6.00 | 6.62 |
| J.R. Irrevocable Trust U/A | 4.94 | 6.10 | 7.01 |

**[*9]**

| | | | |
|---|---|---|---|
| O.R.L. Irrevocable Trust | 4.21 | 5.29 | 6.15 |
| D.L.C. Irrevocable Trust | 5.56 | 6.80 | 7.83 |
| C.L. 2007 Irrevocable Trust | 2.03 | 2.87 | 3.59 |
| Totals | 100.00 | 100.00 | 100.00 |

Marvin owned indirectly interests in the investment LLCs during the tax years in issue, and Keith owned indirectly interests in the investment LLCs during the years that he served as managing member of Lender Management. Through his interests in Marvin Lender Family, LLC, and Marvin Lender 1990 Irrevocable Trust during the tax years in issue Marvin held combined interests in Lenco of 11.47%, 10.65%, and 10.90%, respectively. Through the same entities he held interests in M&M of 5.44%, 2.55%, and 2.81%, respectively, during the tax years in issue. Keith was a member of Marvin Lender Family, LLC. During each of the tax years in issue Keith owned indirectly less than 4% of Lenco and 10% of M&M.

1.     Structure and Purpose

The investment LLCs were created in 2005 as part of a reorganization of Lender Management. The goals of the 2005 reorganization were to accommodate greater diversification of the managed investments and more flexible asset

[*10] allocation at the individual investor level. As part of the restructuring Lender Management shifted from a cost-based office model to a profit-based model.

Lender Management engaged a hedge fund specialist to help it restructure its affairs and its managed portfolio using a hedge fund, or "fund of funds", manager model. Pursuant to the restructuring strategy, Lender Management divided its managed portfolio into the three investment LLCs, each formed for the purpose of holding investments in a different class of assets. M&M invested in private equities, Lenco in hedge funds, and Lotis in public equities.[4] From 2005 forward, over one-half of the assets under management were invested in private equity.

### 2. Operating Agreements

Lender Management's operating agreement permitted it, without limitation, to engage in the business of managing the "Lender Family Office" and to provide management services to Lender family members, related entities, and "other third-party nonfamily members." The operating agreements for the investment LLCs designated Lender Management as the sole manager for each entity. Lender

---

[4]Lotis merged into Lenco in 2010 because Lender Management determined that Lenco's hedge fund investments held enough public equities to meet the company's asset diversification goals.

[*11] Management held the exclusive rights to direct the business and affairs of the investment LLCs.

Lender Management also managed downstream entities in which M&M held a controlling interest. Investors in some of these downstream entities included persons who were not members of the Lender family. It received fees for managing these entities. For the tax years in issue between 12% and 15% of M&M's net investment portfolio consisted of these downstream entities.

Members understood that they could withdraw their investments in the investment LLCs at any time, subject to liquidity constraints, if they became dissatisfied with how the investments were being managed. The operating agreements for Lenco and Lotis provided that members could withdraw all or a portion of their capital accounts on specified dates of each year or on any other date approved by the manager. The operating agreement for M&M provided that members could withdraw all or a portion of their capital accounts with the consent of the manager in the exercise of the manager's discretion.

B.    Compensation

Lender Management received a profits interest in each of the investment LLCs in exchange for the services it provided to the investment LLCs and their members. These profits interests were designated "Class A" interests under the

[*12] operating agreements for the investment LLCs. The class A interests were structured concurrent with Lender Management's reorganization and its shift to a profit-based office model.

Under the initial terms of the operating agreements, effective August 1, 2005, Lender Management was entitled to receive for its class A interests the following percentages: (1) from Lenco, 1% of net asset value annually, plus 5% of any increase in net asset value from the prior fiscal period; (2) from M&M, 5% of gross receipts annually, plus 2% of any increase in net asset value from the prior fiscal period; and (3) from Lotis, 2% of net asset value annually, plus 5% of net trading profits.[5] Lender Management received income from the class A interests only to the extent that the investment LLCs generated profits. Net asset value was defined as the amount by which the fair market value of the investment LLC's assets exceeded its liabilities.

As of December 31, 2010, the operating agreements for M&M and Lenco were amended to provide Lender Management with increased profits interests. The class A interests for M&M and Lenco were increased to equal the aggregate of 2.5% of net asset value, plus 25% of the increase in net asset value, annually.

_____

[5]For Lotis, class A interests were entitled to a share of the adjusted profit as defined in the operating agreement.

[*13] Similar to the initial terms of the operating agreements, Lender Management received payments for its class A interests only to the extent that M&M and Lenco generated net profits. The increased profits interests were intended to more closely align Lender Management's goal of maximizing profits with that of its clients and to create greater incentive for Lender Management and its employees to perform successfully as managers of the invested portfolios. During the tax years in issue any payments that Lender Management earned from its profits interests were to be paid separately from the payments that it would otherwise receive as a minority member of each of the investment LLCs.

C.    Lender Management Services

During the tax years in issue Lender Management made investment decisions and executed transactions on behalf of the investment LLCs. It operated for the purpose of earning a profit, and its main objective was to earn the highest possible return on assets under management. Lender Management provided individual investors in the investment LLCs with one-on-one investment advisory and financial planning services.

Lender Management employed five employees during each of the tax years in issue. It had a total payroll for its employees of $333,200, $311,233, and $390,554 during the tax years in issue, respectively. For tax year 2011 the payroll

[*14] included a $123,249 guaranteed payment to Keith. For tax year 2012 the payroll included a $206,417 guaranteed payment to Keith.

### 1. Role of Keith

Keith was Lender Management's chief investment officer (CIO) during the tax years in issue, and in 2012 he became president. Keith has an undergraduate business degree from Cornell University and a master's degree in business administration (M.B.A.) from the Kellogg School of Management at Northwestern University. After obtaining his M.B.A. he worked for several years in marketing and brand management for major corporations. After joining Lender Management he took continuing education classes in finance and market theory at New York University and classes at Wharton Graduate School of Business.

Keith joined Lender Management full time in 2005 and participated in its reorganization. Beginning early in his business career Keith frequently discussed with Marvin how he could become involved in Lender Management's activities. During the tax years in issue Keith worked approximately 50 hours per week for Lender Management, which included time spent working in the evenings and on weekends.[6]

---

[6]During the tax years in issue Keith taught one business class at a private high school, which met less than weekly.

[*15] Keith referred to the members of the investment LLCs as the clients of Lender Management. Lender Management's clients all had jobs and worked, and Keith had to be available to communicate with them during nonbusiness hours. Mostly he worked out of Lender Management's rented office space in New Jersey. These offices were rented so that Keith could work close to outside consultants. Before becoming Lender Management's managing member in 2010, Keith received wages for his services. Starting in 2011 he received a guaranteed payment.

As CIO, Keith retained the ultimate authority to make all investment decisions on behalf of Lender Management and the investment LLCs. Most of his time was dedicated to researching and pursuing new investment opportunities and monitoring and managing existing positions. For example, he discovered a company in Israel, and Lender Management owned an interest in and participated in the management of this company.

He reviewed personally approximately 150 private equity and hedge fund proposals per year on behalf of the investment LLCs. He met with and attended presentations of hedge fund managers, private equity managers, and investment bankers. Lender Management is not an active trader, but in a typical year the firm

[*16] would enter into multiple new private equity deals and make one or two hedge fund trades.

Lender Management arranged annual business meetings, which were for all clients in the investment LLCs. These group meetings were held so that Lender Management could review face-to-face with all of its clients the performance of their investments at least once per year. The location of the annual meeting changed each year so that no single investor was repeatedly inconvenienced by having to travel a long distance. Because of conflicts Keith had difficulty getting all of Lender Management's clients to attend these meetings. He would conduct additional face-to-face meetings with clients who were more interested in the status of their financial investments at times and locations that were convenient for them.

Keith interacted directly with Lender Management's clients. He collected information from and worked with these individuals to understand their cashflow needs and their risk tolerances for investment, and Lender Management engaged in asset allocation based on these and other factors. Lender Management devised and implemented special ventures known as eligible investment options (EIOs), which allowed clients to participate in investments more directly suited to their age and risk tolerance. Keith developed and maintained a number of computer

[*17] models, including a model that projected the cash needs of individual investors and a model that tracked and forecasted the cashflows associated with M&M's private equity investments.

### 2. Chief Financial Officer

Lona Flament served as Lender Management's chief financial officer, chief operating officer, and controller during the tax years in issue. She is not related to the Lender family. She worked full time, primarily out of the office in Woodbridge, Connecticut (Woodbridge). At the Woodbridge office Lender Management also employed a full-time office manager and, at certain times, other part-time workers.

Ms. Flament worked closely with Keith. During the tax years in issue they spoke over the phone three or four times per day and exchanged between 10 and 50 emails per day. They worked from the same office at least one day per week. Ms. Flament attended manager meetings for investments and assisted Keith in reviewing and making decisions about new investment opportunities.

One of Ms. Flament's primary duties was to oversee daily cash management. She actively monitored the status of current investments to determine how much cash Lender Management had available, and she had authority to move cash on behalf of Lender Management and the investment

[*18] LLCs. She was involved in the process of communicating with individual clients and forecasting their cash needs for the near future. Close monitoring of cash positions was critical to meeting the needs of clients and to covering capital calls that arose in connection with private equity investments.

Lender Management managed M&M's and Lenco's revolving lines of credit during the tax years in issue. As part of her cash management duties, Ms. Flament would secure necessary capital call funds from these lines of credit. To obtain the lines of credit, Lender Management had to produce and provide to creditors extensive financial and other documentation regarding the investment LLCs and their assets. The lines of credit were collateralized by the investment LLCs' private equity investments. To draw down on and keep open the lines of credit for the investment LLCs, Lender Management was required to provide updated financial information to creditors at least monthly. Ms. Flament prepared monthly, quarterly, and annual reports regarding the lines of credit.

### 3. Pathstone

Lender Management interviewed accounting and investment firms to provide outsourced management services beginning in 2006. It hired Harris myCFO, a division of Harris Bank, which provided both accounting and investment advice. In 2010 two of the principals of Harris myCFO formed their

[*19] own firm, Pathstone Family Office, LLC (Pathstone), and Lender Management engaged Pathstone on May 6, 2010.[7] During the tax years in issue Pathstone provided Lender Management with accounting and investment advisory services.

Pathstone's accounting professionals were based in Atlanta, Georgia. Ms. Flament spoke with the accounting professionals over the phone between three and five times per week, and they exchanged between 50 and 100 emails per week. During the tax years in issue Pathstone prepared Lender Management's partnership tax returns. Pathstone also prepared quarterly financial reports for the investment LLCs.

Keith worked at the same office buildings as Pathstone's investment professionals in Englewood Cliffs, and later Fort Lee, New Jersey. He collaborated with Pathstone's principal investment adviser in selecting new investments for the investment LLCs. He presented Pathstone's advisers with his own research on investment opportunities, and he often received their advice

---

[7]Lender Management began the process of terminating its relationship with Harris myCFO in 2009 in anticipation of its move to Pathstone. When discussing outsourced management services received by Lender Management during the tax years in issue we refer hereinafter to Pathstone, although the record is unclear as to whether Lender Management still engaged Harris myCFO in the early months of 2010.

[*20] before acting on prospective deals. Pathstone's advisers also presented him with investment opportunities. Keith exercised ultimate authority over the investment LLCs' investments and did not always follow Pathstone's advice. Pathstone did not have the authority to move cash on behalf of Lender Management or the investment LLCs.

III.    Lender Management's Tax Returns

Lender Management reported ordinary business losses for the tax years in issue. For each of the tax years in issue it claimed deductions for business expenses pursuant to section 162. It claimed deductions for salaries and wages, repairs and maintenance, rent, taxes and licenses, depreciation, retirement plans, employee benefit programs, and other deductions. For 2011 and 2012 it claimed deductions for guaranteed payments to partners. Lender Management's total claimed business expense deductions for the tax years in issue were $1,141,548, $1,115,893, and $1,184,620, respectively.

Respondent issued two FPAAs: one for tax year 2010 and the other for tax years 2011 and 2012. Both FPAAs disallowed the business expense deductions that Lender Management claimed pursuant to section 162 and allowed them pursuant to section 212.

**[\*21]** OPINION

## I. Evidentiary Issue

Respondent reserved objections to paragraphs 58-60 and 78 of the stipulation of facts and to Exhibits 11-J and 26-J.[8] Paragraphs 58-60 and Exhibit 11-J pertain to tax years prior to those in issue. Exhibit 11-J is an examination report and no-change letter issued to Lender Management for tax year 2008. Respondent contends that these paragraphs and the exhibit are not relevant to the tax years in issue.

Paragraphs 58-60 and Exhibit 11-J arguably show that respondent reached different conclusions in prior years regarding the tax treatment of the deductions at issue in these cases. Petitioners contend that the paragraphs and the exhibit are relevant pursuant to rule 401 of the Federal Rules of Evidence, and they rely upon De Boer v. Commissioner, T.C. Memo. 1996-174. In De Boer we held that the taxpayer's deduction of business expenses under section 162 was incorrect. Id. However, we concluded that for purposes of determining the penalty under section 6662 the taxpayer was not negligent and was reasonable in relying on a no-change letter as an indication of the Commissioner's agreement that he continued to be

---

[8]Respondent withdrew objections to paragraph 78 and Exhibit 26-J in respondent's posttrial brief.

[*22] engaged in a trade or business. See id., slip op. at 27-28. In these cases we are not addressing a section 6662 penalty and therefore De Boer is not relevant.

We have rejected arguments about audits for prior years being relevant for the tax years in issue. See Roseman v. Commissioner, T.C. Memo. 2009-185, slip op. at 13. Each taxable year stands alone, and the Commissioner may challenge in a succeeding year what was condoned or agreed to in a previous year. Auto. Club of Mich. v. Commissioner, 353 U.S. 180, 183 (1957); Rose v. Commissioner, 55 T.C. 28 (1970). Paragraphs 58-60 and Exhibit 11-J are not admitted.

## II.      Burden of Proof

Generally the Commissioner's adjustments in an FPAA are presumed correct, and the taxpayer bears the burden of proving those adjustments are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996) ("Petitioner bears the burden of proving respondent's determinations in the FPAA are erroneous."); Clovis I v. Commissioner, 88 T.C. 980, 982 (1987) (holding that an FPAA is the functional equivalent of a notice of deficiency). The burden of proof may shift to the Commissioner if the taxpayer establishes that it complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to

**[*23]** maintain required records, and to cooperate fully with the Commissioner's reasonable requests.

Petitioners claim they meet the requirements of section 7491(a) to shift the burden of proof to respondent regarding the section 162 deductions. The resolution of this issue, however, does not depend on which party has the burden of proof. We resolve it on a preponderance of the evidence in the record. See Dagres v. Commissioner, 136 T.C. 263, 279 (2011).

III. Deductions for Business Expenses

Section 162 allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 212(1) allows an individual a deduction for ordinary and necessary expenses paid or incurred in connection with an activity engaged in for the production or collection of income. Although the purpose of these two sections was "to place all income-producing activities on an equal footing" in terms of allowable deductions, United States v. Gilmore, 372 U.S. 39, 49 (1963), certain limitations apply to deductions claimed under section 212 that do not apply to deductions under section 162, see Green v. Commissioner, T.C. Memo. 2005-250, slip op. at 27, aff'd, 507 F.3d 857 (5th Cir. 2007).

**[\*24]** Expenses deducted under section 162(a) generally are subtracted in full from gross income to arrive at adjusted gross income.  However, expenses deducted under section 212 ordinarily are subtracted from adjusted gross income to arrive at taxable income and are subject to certain floor limitations in section 67(a).  A deduction under section 212 may also be limited by application of the alternative minimum tax.  See sec. 56(b); see also Guill v. Commissioner, 112 T.C. 325, 328-329 (1999).  Additionally, net operating losses may carry over under section 172 from the year in which they were incurred to another year only if the losses were the result of operating a trade or business within the meaning of section 162(a).  See Todd v. Commissioner, 77 T.C. 246, 248 (1981), aff'd, 682 F.2d 207 (9th Cir. 1982).

The Code does not define the term "trade or business".  Deciding whether the activities of a taxpayer constitute a trade or business requires an examination of the facts in each case.  Higgins v. Commissioner, 312 U.S. 212, 217 (1941).

To be engaged in a trade or business, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  A sporadic activity, a hobby, or an amusement diversion does not qualify.  Id.  Although the taxpayer's activities need

[*25] not generate an immediate profit or produce a profit for the tax year in issue, the taxpayer must initiate or carry on the enterprise in good faith for the purpose of making a profit. Id.; see also Barker v. Commissioner, T.C. Memo. 2012-77, slip op. at 11.

Certain activities are not considered trades or businesses. An investor is not, by virtue of his activities undertaken to manage and monitor his own investments, engaged in a trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963); Higgins v. Commissioner, 312 U.S. at 218. "No matter how large the estate or how continuous or extended the work required may be", overseeing the management of one's own investments is generally[9] regarded as the work of a mere investor. Higgins v. Commissioner, 312 U.S. at 218. Expenses incurred by the taxpayer in trading securities or performing other investment-related activities strictly for his own account generally may not be deducted under section 162 as expenses incurred in carrying on a trade or business. See id.; Beals v. Commissioner, T.C. Memo. 1987-171. The taxpayer's activities as an investor may produce income or profit, but profit from investment is not taken as evidence

---

[9]An exception to the general rule applies when the taxpayer is also an active trader of securities. See Moller v. United States, 721 F.2d 810 (Fed. Cir. 1983); Liang v. Commissioner, 23 T.C. 1040 (1955). Petitioners do not contend that Lender Management operated as a trader during the tax years in issue.

[*26] that the taxpayer is engaged in a trade or business.  Any profit so derived

arises from the successful conduct of the trade or business of the corporation or

other venture in which the taxpayer has taken a stake, rather than from the

taxpayer's own activities.  Whipple v. Commissioner, 373 U.S. at 202.

A common factor distinguishing the conduct of a trade or business from

mere investment has been the receipt by the taxpayer of compensation other than

the normal investor's return.  Whipple v. Commissioner, 373 U.S. at 202-203.

Compensation other than the normal investor's return is income received by the

taxpayer directly for his or her services rather than indirectly through the corporate

enterprise.  Id. at 203.  If the taxpayer receives not just a return on his or her own

investment but compensation attributable to his or her services provided to others,

then that fact tends to show that he or she is in a trade or business.  Dagres v.

Commissioner, 136 T.C. at 281-282.  The trade-or-business designation may apply

even though the taxpayer invests his or her own funds alongside those that are

managed for others, provided the facts otherwise support the conclusion that the

taxpayer is actively engaged in providing services to others and is not just a

passive investor.  Id. at 282, 285-286.

An activity that would otherwise be a business does not necessarily lose that

status because it includes an investment function.  Id. at 281.  Work that includes

**[\*27]** investing or facilitating the investing of others' funds may qualify as a trade or business.  Id.  In Dagres we held that "[s]elling one's investment expertise to others is as much a business as selling one's legal expertise or medical expertise."  Id.  Investment advisory, financial planning, and other asset management services provided to others may constitute a trade or business.  See id.

A.  Positions of the Parties

Petitioners contend that Lender Management's activities during the tax years in issue meet the test for an active trade or business under Groetzinger.  They contend that Lender Management provided investment management and financial planning services to others during the tax years in issue and that these activities constituted a trade or business.  Petitioners also contend that Lender Management and the investment LLCs must be respected as separate business entities distinct from their owners and that these entities engaged with one another at arm's length.

Respondent contends that Lender Management's activities did not constitute carrying on a trade or business.  Respondent contends that Lender Management's primary activity is managing the Lender family fortune for members of the Lender family by members of the Lender family.

**[\*28]** B.   Analysis

Groetzinger does not create a single test that would be dispositive in all cases on the issue of a trade or business.  See Commissioner v. Groetzinger, 480 U.S. at 36.  This Court has traditionally viewed that case as setting certain uniform requirements which must be met for all trades or businesses, and we treat it as a starting point for evaluating all trade or business determinations.  See, e.g. Barker v. Commissioner, T.C. Memo. 2012-77; McManus v. Commissioner, T.C. Memo. 1987-457, aff'd without published opinion, 865 F.2d 255 (4th Cir.1988).  In prior cases we have looked at the following three factors:  (1) whether the taxpayer undertook the activity intending to make a profit; (2) whether the taxpayer was regularly and actively involved in the activity; and (3) whether the taxpayer's business operations had actually commenced.  See McManus v. Commissioner, T.C. Memo. 1987-457.

These three general requirements have been met, and the parties are not disputing these requirements.  The parties dispute whether the activities of Lender Management constitute a trade or business.  First, we will consider the activities of Lender Management.  Second, we will consider the familial aspect of the activities.

[*29]      1.      Activities of Lender Management

Lender Management provided investment advisory and financial planning services for the investment LLCs and their individual investors.  Its employees worked full time.  Keith's work involved researching investment opportunities, negotiating and executing new investments, monitoring existing positions, and working with individual clients to understand their investment needs.

Ms. Flament assisted Keith in performing his duties, and she was also responsible for overseeing Lender Management's financial accounting, compliance, and cash management.  She expended considerable time and effort keeping open multiple revolving lines of credit, which were necessary for the investment LLCs' ongoing investment activities.  Lender Management employed a full-time office manager and part-time employees, and it engaged the services of an outside firm to supplement its ability to provide its clients a complete set of investment management services.

The services Lender Management provided to its clients were comparable to the services that hedge fund managers provide.  Lender Management had a responsibility to provide its clients with sound investments with growth potential and investments tailored to their financial needs.  Lender Management's activities

**[*30]** in these cases went far beyond those of an investor. See Dagres v. Commissioner, 136 T.C. 263.

In Dagres the management entity provided the facilities and staff to perform the venture capital business, and this staff helped with identifying and researching potential investment targets and helped manage the investments. Id. at 268. Lender Management performed services similar to those in Dagres. Through the operating agreements Lender Management had the exclusive right to direct the business and affairs of the investment LLCs. Lender Management and its staff found various investments, investigated potential investments, managed cashflow, prepared asset allocations, and performed other related functions.

Lender Management was entitled to profits interests as compensation for its services to its clients to the extent that it successfully managed its clients' investments. In Beals v. Commissioner, T.C. Memo. 1987-171, the taxpayer actively investigated and followed the investments made by him and his family, but he did not receive compensation attributable to his services for overseeing his family member's accounts. He benefited solely from his share of dividends, which constituted a normal investor's return, and he operated under the name of a firm that was previously dissolved. Id. Lender Management was a duly constituted business entity, and it was entitled to profits interests for services.

**[*31]** Lender Management and its managing members during the tax years in issue held minority interests in the investment LLCs. In <u>Dagres v. Commissioner</u>, 136 T.C. at 285, the management entities held 1% capital interests in the underlying investment funds. The management entities were also entitled to 20% profits interests as compensation for their services as the funds' managers. <u>Id.</u> These profits interests were the primary incentive for the management entities to work to maximize the funds' success. <u>Id.</u> We cited the disproportion between the capital and the profits interests as a reason for concluding that the predominant activity of the management entities was management of investments for others rather than investing for their own account. <u>Id.</u> at 285-286.

In <u>Dagres</u> the management entities received management fees of 2% to 2.5% of the total committed capital in the funds. <u>Id.</u> at 268. Lender Management did not receive similar fees. Lender Management received payment for its services only if the investment LLCs earned net profits. The absence of fees motivated Lender Management to increase the net values of the investment LLCs.

To the extent that the net assets of the investment LLCs increased in value, the operating agreements provided that Lender Management could receive compensation separate from and in addition to the amounts that it received for its membership interests. In 2010 the class A profits interests for M&M and Lenco

[*32] did not offer Lender Management as great an opportunity for earnings as they did in later years. Nevertheless, the 2010 profits interests represented potential compensation separate from and in addition to Lender Management's normal investor's return, and these profit interests provided substantial incentive to deliver high-quality management services.

In 2011 and 2012 the amended class A interests guaranteed Lender Management a share of potential profits separate from and in addition to what it would receive with respect to its investments. The contingent nature of the profits interests does not negate their being compensation for services. Lender Management's compensation structure shows that during the tax years in issue its predominant activity was providing investment management services to others, rather than passive investing. See id. at 286.

During the tax years in issue Lender Management held membership interests in Lenco of 4.60%, 5.13%, and 6.34%, respectively, and in M&M of 0.40%, 4.87%, and 8.26%, respectively. Although in most years Lender Management's interests exceeded the 1% held by the management entities in Dagres, these interests each year were far less than what it could have earned for its services via contingent profits interests payments. Between 91.74% and 99.6%

[*33] of the portfolios that Lender Management managed for Lenco and M&M were made up of investments beneficially owned and controlled by others.

Lender Management's activities were providing investment management services, which it primarily provided to and for the benefit of clients other than itself. As in Dagres we conclude that Lender Management was in the business of providing investment management services to its clients.

### 2. Family Relationship

These cases differ from Dagres in that a family relationship and connection existed between the managing members of Lender Management and the owners of the investment LLCs. Respondent cites this aspect of the relationship between the entities in support of respondent's contention that Lender Management's activities consisted solely of making investments on its own behalf.

Pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, there are partnership and nonpartnership items. A partnership item means any item taken into account for the partnership's taxable year. Sec. 6231(a)(3). The disputed deductions are partnership items attributable to Lender Management, and section 6221 provides that the tax treatment of these items shall be determined at the partnership level. We examine the facts and circumstances specific to Lender Management, rather

**[\*34]** than the investment LLCs or their members, to determine whether it carried on a trade or business. Respondent contends in respondent's reply brief that this Court "often considers the relationship between people who interact through entities for the obvious reason that the relationships between the individuals might affect how the entities interact with each other". Respondent further contends that managing investments for yourself and for members of your family is not within the meaning of a trade or business for the purpose of section 162.

Generally transactions within a family group are subjected to heightened scrutiny. Estate of Bongard v. Commissioner, 124 T.C. 95, 119 (2005); Cirelli v. Commissioner, 82 T.C. 335, 343 (1984). Where a payment is made in the context of a family relationship, we carefully scrutinize the facts to determine whether there was a bona fide business relationship and whether the payment was not made because of the familial relationship. See Commissioner v. Culbertson, 337 U.S. 733, 746 (1949); Martens v. Commissioner, T.C Memo. 1990-42, aff'd without published opinion, 934 F.2d 319 (4th Cir. 1991). In DiDonato v. Commissioner, T.C. Memo. 2013-11, we concluded that certain payments between cousin-owned businesses were not deductible. The payments were not deductible because the record did not establish that services were actually rendered.

[*35] We find that Lender Management satisfies a review under heightened scrutiny. The end-level investors in the investment LLCs during the tax years in issue were all members of the Lender family. Lender Management's CIO, Keith, is a member of the Lender family. His father Marvin was managing member and 99%-owner of Lender Management in 2010, and Keith occupied the same position in 2011 and 2012. At all relevant times only two members of the Lender family were owners of Lender Management.

Separate from Lender Management, Marvin owned 11.47% of Lenco and 5.84% of M&M in 2010. Keith owned indirectly less than 4% of Lenco and 10% of M&M during the years he served as managing member.

There was no requirement or understanding among members of the Lender family that Lender Management would remain manager of the assets held by the investment LLCs indefinitely. Lender Management's investment choices and related activities were driven by the needs of clients, and its clients were able to withdraw their investments if they became dissatisfied with its services. Investors in Lenco and Lotis were entitled to withdraw their capital interests for any reason at least annually. Although a complete withdrawal from M&M required the manager's approval, we are satisfied on the facts before us that there was a

[*36] common understanding that Lender Management would grant such approval if any investor became unhappy with how his or her funds were being managed.

Apart from what they received as returns on their respective investments, Lender Management's clients generally earned employment income. For example, Carl worked in sales for a cable communications company. Keith, like Carl, would have benefited from his membership in the investment LLCs during the tax years in issue regardless of whether he chose to work for Lender Management. Keith's position compensated him for the services that he provided to Lender Management, and it was his only full-time job during the tax years in issue. As managing member he was highly motivated to excel and to see Lender Management receive the benefit of the class A interests.

Although each investor in the investment LLCs was in some way a member of the Lender family, Lender Management's clients did not act collectively or with a single mindset. Lender Management's clients were geographically dispersed, many did not know each other, and some were in such conflict with others that they refused to attend the same business meetings. Their needs as investors did not necessarily coincide. Lender Management did not simply make investments on behalf of the Lender family group. It provided investment advisory services and managed investments for each of its clients individually, regardless of the

[*37] clients' relationship to each other or to the managing member of Lender Management.

In Higgins v. Commissioner, 312 U.S. at 213, the taxpayer maintained two offices the operations of which were to manage his personally held investments in real estate, bonds, and stocks. The Commissioner disallowed deductions claimed for salaries and expenses allocable to the management of the taxpayer's securities, and the Supreme Court upheld the Commissioner's determination, observing that the taxpayer "merely kept records and collected interest and dividends from his securities, through managerial attention for his investments." Id. at 218. Lender Management was not managing its own money. Most of the assets under management were owned by members of the Lender family that had no ownership interest in Lender Management. Lender Management managed investments and did substantially more than keeping records and collecting interest and dividends.

In Beals v. Commissioner, T.C. Memo. 1987-171, we rejected the taxpayer's contention that he was engaged in a trade or business managing investments owned by him, his wife, and three of his children. In that case there was no business relationship. By contrast Lender Management had an obligation to its clients, and it tailored its investment strategy, allocated assets, and performed other related financial services specifically to meet the needs of its clients.

[*38] There is no dispute that Lender Management provided services. The profits interests were provided in exchange for services and not because Marvin and Keith were part of the Lender family. The Lender family members that participated in the investment LLCs expected Lender Management to provide them with services similar to those of a hedge fund manager. The relationship between Lender Management and the investment LLCs was a business relationship.

Respondent cites no applicable attribution rules that would require us to treat Lender Management or its managing member as owning all of the interests in the investment LLCs. Lender Management carried on its operations in a continuous and businesslike manner for the purpose of earning a profit, and it provided valuable services to clients for compensation. For the tax years in issue Lender Management was carrying on a trade or business for the purpose of section 162.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for petitioners</u>.